UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| REGINALD MASON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05 C 1515 |
| | ) | |
| THE CITY OF CHICAGO, REV. LUCIUS | ) | Judge Ruben Castillo |
| HALL, Chairman of the CITY OF | ) | |
| CHICAGO PERSONNEL BOARD; DON | ) | |
| A. TURNER, Member of the CITY OF | ) | |
| CHICAGO PERSONNEL BOARD; | ) | |
| GLENN E. CARR, as Commissioner of the | ) | |
| CITY OF CHICAGO PERSONNEL | ) | |
| DEPARTMENT; and THE CITY OF | ) | |
| CHICAGO PERSONNEL DEPARTMENT, | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Reginald Mason sued the City of Chicago ("City") for: 1) race and gender discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*; 2) race discrimination and retaliation under 42 U.S.C. § 1981; 3) retaliation in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*; and 4) age discrimination and retaliation in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a) and (d). (R. _, Am. Compl.at 1-2.)[1] Defendants have moved for summary judgment on all of Mason's claims. (R. 49-1, Defs.' Mot. for Summ. J.)

Mason also sought administrative review of the Personnel Board of the City of Chicago's decision not to reinstate him to his position as a Personnel Analyst II. However, he asks the Court to dismiss this claim in his response brief. Therefore, this Court dismisses this claim with

---

[1] The amended complaint does not have a record number. Therefore, we will identify it as R. _.

prejudice. For the reasons set forth below, the motion for summary judgment is granted in part and denied in part.

**RELEVANT FACTS**[2]

## I.    Mason's Problems with His Supervisors

Mason was a Personnel Analyst II with the City of Chicago, Department of Human Resources ("CDHR") in a sub-division known as the Employment Services Division from June 1, 1985 until January 11, 2005. (R. 60, Pl.'s Resp. to Defs.' Facts ¶¶ 21, 63.) The Employment Services Division receives employment applications for the entire city, processes those applications, meets with other city departments to coordinate the hiring process, assists city departments in meeting their hiring goals, and staffs the application center on the first floor of City Hall. (*Id.* ¶ 15.) Glenn Carr is the Commissioner of the CDHR. Mason's immediate supervisors were Carol McGuire—the head of the employment subdivision; Ann Nakaguchi; and Patrick Ward. (*Id.* ¶¶ 14, 16.) The Personnel Analysts at CDHR were grouped into three categories. A Personnel Analyst I typically had less city departments to oversee than a Personnel Analyst II or III. (*Id.* ¶ 18.) The Personnel Analyst III had the most duties. (*Id.*) The primary duties of a Personnel Analyst II included: conducting position classification audits, job analysis, scoring applications for minimum qualifications, creating referral lists for hiring departments and accepting employment applications. (*Id.* ¶ 19.) The parties dispute the length of time in which a Personnel Analyst is required to process an employment application. (*Id.*)

The parties dispute whether Mason had any performance issues during his tenure with the

---

[2]These facts are derived from the parties' statements of facts filed pursuant to Local Rule 56.1(b). Unless otherwise indicated, the facts included herein are undisputed.

CDHR. The City Personnel Rules state that the performance of all employees should be evaluated periodically. (R. 63-1, Defs.'Resp. to Pl.'s Add'l Facts ¶ 116.) Mason, however, had not received a formal, written evaluation in over ten years. (*Id.*) The City also maintains a goal, not necessarily mandatory, of using a progressive disciplinary policy with increasing levels of severity ranging from written reprimands to suspension to demotion and finally discharge. (*Id.* ¶ 117.) Mason received three written reprimands in the late 1980s for allegedly failing to maintain his files and information properly, but he has not received any written reprimands since that time. (R. 60, Pl.'s Resp. to Defs.'Facts ¶¶ 23-24.) Mason has never been suspended or demoted for poor performance. (R. 63-1, Defs.'Resp. to Pl.'s Add'l Facts ¶ 118.)

The City asserts that it made Mason aware of his performance deficiencies on several different occasions. McGuire and Ward claim that they met with Mason three times to discuss his failure to complete projects in a timely manner, but Mason denies that two of these three meetings took place. (R. 60, Pl.'s Resp. to Defs.'Facts ¶¶ 25, 27.) The City contends, for example, that McGuire and Ward met with Mason in September 2001 to discuss his failure to complete a project for the Sewer Department properly. (*Id.* ¶ 25.) Mason states that he does not remember this meeting nor does he recall Ward ever requesting hire forms for the Department of Sewers, which was the issue that the City asserts prompted the meeting. McGuire and Ward also allegedly informed Mason that his workspace was disorganized and had a large number of papers unrelated to his duties. (*Id.*) Mason disputes that his workspace was in disarray. (*Id.*)

Mason acknowledges having a conversation with McGuire, Nakaguchi, and Ward in September 2002, but the parties dispute what was discussed in this meeting. The City contends that the supervisors confronted Mason about a large number of errors in the postcard database

3

that Mason maintained, his failure to be at his desk, his failure to be current on scoring applications, and his non-work related calls and visitors. (*Id.* ¶ 26.) Mason contends that at this meeting, his supervisors asked him to check another employee's work because that employee was making a lot of mistakes and none of these other issues was discussed. (*Id.*) He also contends that McGuire also would question any person or employee who met Mason at his desk as to why they were there to see him and she would also question Mason about his whereabouts when he was not at his desk. (R. 63-1, Defs.' Resp. to Pl.'s Add'l Facts ¶ 84.)

The City also asserts that in August of 2003, McGuire and Ward met with Mason to discuss a project for the Department of Procurement that Mason failed to complete on time as well as Mason's possible abuse of the City's sick time policy. (R. 60, Pl.'s Resp. to Defs.' Facts ¶ 27.) Mason claims this meeting did not take place. Mason further claims that Mike Sulewski, head of the Department of Procurement, did not tell him that there was any deadline or rush to complete the assignment. (*Id.*) Mason was not subjected to formal discipline for any of these incidents. (R. 63-1, Defs.' Resp. to Pl.'s Add'l Facts ¶ 121.)

It is undisputed that Mason requested help from his supervisors but did not receive it for several other projects. (*Id.* ¶ 75.) In contrast, Elizabeth Opel and Martha Marquez, both Personnel Analysts III, received help from supervisors and other personnel analysts when they requested it. (*Id.* ¶ 70.)

## II.      Mason's Request for FMLA Leave

In September 2003, Mason orally indicated to McGuire that he would need to take FMLA leave to take his son to psychiatric treatments. (R. 60, Pl.'s Resp. to Defs.'Facts ¶ 36.) On October 17, 2003, Mason formally requested FMLA leave. (*Id.*) Mason requested that the leave

4

begin on October 20, 2003 and that it be taken in half-day increments from noon through the remainder of the day until November 1, 2003. (*Id.*) Mason also requested five weeks of full-day leave after the initial two weeks of half-day leave. (*Id.*) Carr approved Mason's FMLA request. (*Id.* ¶ 37.) On October 21, 2003, Mason did not appear for work. (*Id.* ¶ 38.) Instead, he called Nakaguchi and informed her that he needed to take full-days instead of half-days to accompany his son. (*Id.*) Mason's supervisors approved his request to take full-days leave. (*Id.*)

While Mason was on FMLA leave, McGuire, Nakaguchi, and Ward made plans to distribute Mason's work to other analysts so that it could be completed while he was on leave. (*Id.* ¶ 40.) Mason's supervisors claim while they were retrieving paperwork from Mason's cubicle, they noticed that Mason had a large amount of employment applications at his workspace that had not been properly processed. (*Id.* ¶ 41.) Part of Mason's duties included ensuring that such applications were properly graded or scored. Nakaguchi and Ward allege that Mason had 636 applications of persons who Mason determined were qualified for the position they applied for, but whose applications had not been made available for departments to review. (*Id.*) There is not, however, a written rule that required applications to be in the file room or vault to be considered fully graded or scored. (R. 63-1, Defs.'Resp. to Pl.'s Add'l Facts ¶ 101.) The City asserts that Mason also had 479 applications in his cubicle that had not been processed at all, four of which were from the year 2000. (R. 60, Pl.'s Resp. to Defs.'Facts ¶ 41.) Mason denies all of these assertions, stating that most of the applications found on his desk were scored in a timely manner and entered into the computer while other unscored applications arrived while Mason was on FMLA leave. (*Id.*) According to Mason, since the scores were in the data base, all of the applications were available for any department or analyst to review. (*Id.*) Nakaguchi

5

and Ward documented the work that allegedly had not been completed by Mason and McGuire presented their findings to Carr. (*Id.* ¶ 42.)

## III. Mason's Termination

Mason returned to work on November 3, 2003. (R. 60, Pl.'s Resp. to Defs.' Facts ¶ 44.) McGuire did not assign Mason to process applications upon his return from FMLA leave. (*Id.* ¶ 45.) Instead, she assigned him to different duties such as purging and shredding documents and working the application counter. (R. 63-1, Defs.'Resp. to Pl.'s Add'l Facts ¶ 93.) Mason's supervisors stated that he was given these assignments in case he needed to take additional FMLA leave, but Mason informed them that he would not need any additional leave. (*Id.*) After Mason returned from FMLA leave, Carr spoke with Mason about his alleged dereliction of duty. (R. 60, Pl.'s Resp. to Defs.'Facts ¶ 46.) Carr terminated Mason based on McGuire's report that Mason had several hundred to more than a thousand applications in his cubicle that were not properly processed. (*Id.* ¶ 47.) On December 12, 2003, Mason was placed on involuntary leave with pay. (R. 63-1, Defs.'Resp. to Pl.'s Add'l Facts ¶ 94.) On February 2, 2004, Mason sent a letter to Commissioner Carr alleging discrimination based on race, sex, age, and the FMLA. (R. 60, Pl.'s Resp. To Defs.'Facts ¶ 58.) On January 11, 2005, the Personnel Board found that Mason had committed violations of the Personnel Rules and upheld his discharge. (*Id.* ¶ 63.) This lawsuit followed.

## LEGAL STANDARDS

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must "construe all facts in the light most favorable to the nonmoving party and draw all reasonable and justifiable inferences in favor of that party." *King v. Preferred Tech. Group*, 166 F.3d 887, 890 (7th Cir. 1999). Weighing evidence and making credibility decisions are jury functions, and it is not appropriate for a judge to assume those functions when deciding a summary judgment motion. *Anderson*, 477 U.S. at 255. Accordingly, we apply the summary judgment standard with special scrutiny to employment discrimination cases, where issues of intent and credibility often are paramount. *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002). "Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004) (internal citations omitted); *O'Neal v. City of Chi.*, 392 F.3d 909, 912 (7th Cir. 2004).

## ANALYSIS

I.   **FMLA Claim**

The FMLA allows employees to take periods of leave from their jobs for various health and family related reasons. Specifically, the FMLA allows a worker to take unpaid leave for a period of up to twelve weeks for reasons that include the birth of a child, the illness of an immediate family member, or the serious health condition of the employee himself. 29 U.S.C. § 2612(1). Upon return to work the employee is guaranteed reinstatement to the employee's original position or an "equivalent position." 29 U.S.C. § 2614(1). The FMLA, however, does not entitle any employee to "any right, benefit, or position of employment other than . . . [that]

7

which the employee would have been entitled had the employee not taken leave." 29 U.S.C. § 1614(3).

We analyze FMLA claims in the same manner as claims brought under other employment statutes, such as Title VII or the ADEA. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). A plaintiff may prove a FMLA retaliation claim through either the direct or indirect method. The direct method requires a showing of intentional discrimination either through direct or circumstantial evidence. *See id.* Direct evidence "usually requires an admission by the [decisionmaker] that his actions were based on [the protected status]", i.e., FMLA leave. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 321 (7th Cir. 2002); *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002) (holding that direct evidence is limited to "evidence that establishes [retaliation] without resort to inferences from circumstantial evidence"). Circumstantial evidence "allows a jury to infer intentional discrimination by the decision-maker." *Buie*, 366 F.3d at 503. The indirect method is the burden-shifting framework established by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), which requires that the plaintiff to establish: after taking FMLA leave (the protected activity) he was treated less favorably than other similarly situated employees who did not take FMLA leave, even though he was performing his job in a satisfactory manner. *Hull v. Stoughton Trailers, LLC*, 445 F.3d 949, 951 (7th Cir. 2006).

Mason does not identify which method he is proceeding under. However, he does present direct evidence of retaliation. Mason claims that the City retaliated against him for taking FMLA leave by stripping him of his regular duties and assigning him to different tasks once he returned to work. Mason's supervisors told him that he was only given these assignments in case he

8

needed to take additional FMLA leave, despite the fact that he told them no additional leave would be needed. The City does not dispute this. (R. 63-1, Defs.'Resp. to Pl.'s Add'l Facts ¶ 93.) Mason went from scoring the applications of potential City employees to purging and shredding documents and working the application counter. Arguably, these tasks are not equivalent. The City argues that McGuire did not assign Mason to his old duties upon his return from FMLA leave because his tasks had already been reassigned and because she had concerns about Mason's failure to process over 1000 applications. (R. 50-1, Defs.'Facts ¶ 45.) Accordingly, there is an issue of material fact as to the City's intent in stripping Mason of his job duties. As the Seventh Circuit has noted, "when an employee raises the issue of whether the employer discriminated against an employee by taking adverse action against the employee for having exercised an FMLA right, the question of intent is relevant. The issue becomes whether the employer's actions were motivated by an impermissible retaliatory or discriminatory animus." *King*, 166 F.3d at 891. Based on the City's admissions, a reasonable jury could conclude that but for Mason taking FMLA leave, his supervisors would not have taken away his job duties. *Robin v. ESPO Eng'g Corp.*, 200 F.3d 1081, 1089 (7th Cir. 2000).

Mason also argues that he was terminated in retaliation for taking FMLA leave. Because we have found that his FMLA leave may have been a determining factor in the City's decision to change his job duties, we are all the more cautious in determining whether his termination was tainted by the same impermissible motive. The City argues that Mason was terminated for failing to process over 1000 applications for employment with the City. Mason disputes this, stating that McGuire "never mentioned the 'stacks of applications' that were 'secreted away' until after Plaintiff returned from FMLA leave;" that it was common for analysts to keep scored

9

applications at their desk; and that some of the applications had been recently received which was why they had not been scored.

Drawing all inferences in favor of Mason, it is possible that a reasonable factfinder could conclude that the City further discriminated against him by terminating him for taking FMLA leave. As indicated above, there is direct evidence that Mason's supervisors impermissibly changed his duties after he returned from FMLA leave, and this fact can constitute circumstantial evidence that he was terminated for taking FMLA leave. Other circumstantial evidence that Mason may have been terminated for taking FMLA leave includes: the fact that other analysts kept completed applications at their desk but were not disciplined, (R. 63-1, Defs.' Resp. to Pl.'s Add'l Facts ¶ 102); Mason had not been disciplined for any alleged performance deficiencies since 1989, (*Id.* ¶ 118); Mason had not received any formal, written performance evaluations although the City claims he suffered from various performance related issues, (*Id.* ¶ 116); and Mason requested help with his workload from his supervisors but did not receive any help although other analysts received help when they requested it, (*Id.* ¶ 75). *See Mlynczak v. Bodman*, 442 F.3d 1050, 1057 (7th Cir. 2006) (noting that the direct method of proving discrimination includes the possibility of showing discrimination by circumstantial evidence). Accordingly, this Court finds that Mason's FMLA claim is not appropriate for resolution on summary judgment.

## II.    Title VII and ADEA Claims

Title VII of the Civil Rights Act of 1964 prohibits employers from treating employees differently on the basis of race or sex, 42 U.S.C. § 2000e-2(a)(1), and from retaliating against an employee for opposing any practice deemed unlawful under the Act, 42 U.S.C. § 2000e-3(a).

Similarly, the ADEA proscribes employment discrimination on account of a person's age. 29 U.S.C. § 623. Mason can avert summary judgment either by producing enough evidence of discriminatory intent to create a triable issue of fact, or by establishing a prima facie case under the *McDonnell Douglas* formula. *Rudin v. Lincoln Land Cmty. College,* 420 F.3d 712, 724 (7th Cir. 2005). If Mason establishes a prima facie case of race, sex, or age discrimination or of retaliation, the burden shifts, requiring the City to come up with a noninvidious reason for the adverse action. *Whittaker v. N. Ill. Univ.,* 424 F.3d 640, 647 (7th Cir. 2005). If the City cannot satisfy its burden, the Court will deny summary judgment. *Id.* at 647.

Mason has not presented any direct evidence of discrimination on the basis of his race, sex, and age. Therefore, this Court will analyze his claim under the indirect method. To establish a prima facie case of race or gender discrimination under Title VII and age discrimination under the ADEA, a plaintiff must establish: 1) he is a member of a protected class; 2) he was meeting his employer's legitimate performance expectations; 3) he suffered an adverse employment action; and 4) he was treated less favorably than similarly situated individuals who are not members of his protected class. *Ballance v. City of Springfield,* 424 F.3d 614, 617 (7th Cir. 2005); *Whittaker,* 424 F.3d at 647. Mason alleges that the City discriminated against him by: 1) terminating his employment; 2) denying him assistance in processing his work while making assistance available to non-African American, female employees under 40; 3) conducting surveillance of Mason's performance in excess of their observation of non-African American, female, younger employees; and 4) failing to promote him. Mason further argues that the City retaliated against him for sending a letter to Carr which alleged that the City had discriminated against him on the basis of race, sex, age, and for taking FMLA leave. We will

11

analyze each of these assertions in turn.

### A. Mason's Termination

#### 1. Prima Facie Case

The City does not dispute that Mason has met the first two prongs of the test for establishing a prima facie case of discrimination—he is black, male, over 40, and suffered an adverse employment action—his termination. The City argues, however, that Mason cannot prove the third prong: that there are similarly situated employees whom it treated more favorably. Although Mason identifies two employees— Elizabeth Opel and Martha Marquez—as being similarly situated for purposes of his race, gender, and age discrimination claims, Mason has not any evidence to show that Marquez was a non-African American female under 40. This Court cannot assume facts not in evidence. *See Shepard v. Slater Steels Corp.*, 168 F.3d 998, 1006 n.4 (7th Cir. 1999). Therefore, we will compare only Opel and not Marquez to Mason for purposes of these claims. Mason only has to identify one employee who is similarly situated for purposes of this prong. *See, for example, Bio v. Fed. Express Corp.*, 424 F.3d 593, 598 (7th Cir. 2005).

The City states that Opel is not similarly situated because she is a Personnel Analyst III, whereas Mason is a Personnel Analyst II. This, however, is not dispositive. *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 743 (7th Cir. 1999) (noting that "[a]n employer cannot insulate itself from claims of racial discrimination simply by providing different job titles to each of its employees"). To demonstrate that another employee is "similarly situated," a plaintiff must show that:

> there is someone who is directly comparable to her in all material respects. [A] court must look at all relevant factors, the number of which depends on the context of the case. Such factors include whether the employees 'dealt with the

12

same supervisor' and were 'subject to the same standards' . . . [and] had comparable 'experience, education and qualifications.'

*Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (citations omitted).

It is undisputed that Opel is a non-African-American woman under the age of 40. Mason and the other analysts all reported to the same supervisors and were subject to the same standards. The only difference in the positions are the number of City departments that an analyst is responsible for. The Personnel Analyst III was responsible for more departments than the other analysts, but there is no indication in the record that the caliber of the work was different among analysts. (R. 60, Pl.'s Resp. to Defs.'Facts ¶ 18.) Mason contends, however, that although he was a Personnel Analyst II, he is similarly situated to a Personnel Analyst III because his workload was considerably more than that of other analysts. Mason points to several tasks assigned to him in addition to his normal job duties and he also argues that he was responsible for twenty more job titles than other analysts. (R. 63-1, Defs.'Resp. to Pl.'s Add'l Facts ¶¶ 70-71.) While the City concedes that Mason was given these tasks, it denies that any of the assignments would have taken a long time or that the number of job titles an analyst is responsible for corresponds to his or her workload. However, Mason has presented enough evidence to raise an inference that his workload was sufficiently similar to that of a Personnel Analyst III to demonstrate that he and Opel are similarly situated. *Goodwin v. Bd. of Trs. of the Univ. of Ill.*, 442 F.3d 611, 619 (7th Cir. 2006) ("the other employees must have engaged in similar—not identical—conduct to qualify as similarly situated").

Mason has also presented evidence that the City was applying the standards for its legitimate employment expectations disparately between himself and Opel. For example, Mason

requested help from his supervisors but did not receive it, (R. 63-1, Pl.'s Resp. to Defs.' Facts ¶ 75), although Opel received help from supervisors and other personnel analysts when she requested it. (*Id.* ¶ 70.) "When a plaintiff produces evidence sufficient to raise an inference that the employer applied its legitimate expectations in a disparate manner, the second and fourth prongs of McDonnell Douglas merge, allowing the plaintiff to establish a prima facie case by establishing that similarly situated employees were treated more favorably." *Grayson v. O'Neill*, 308 F.3d 808, 818 (7th Cir. 2002). Given the evidence that the City treated Opel and Mason disparately, Mason simply must show that Opel was treated more favorably. Mason was fired for allegedly failing to score hundreds of applications of applications. However, Opel was not disciplined or fired even though she would often have scored applications at her desk, was sometimes behind in her work, and did not always complete applications within the six to eight week time frame, although it is disputed whether this is more of a guideline than a mandate. (R. 63-1, Pl.'s Resp. to Defs.' Facts ¶¶ 74, 102,104; R. 60, Pl.'s Resp. to Defs.' Facts ¶ 102.) Furthermore, Mason had not been subject to any formal disciplinary action for alleged performance deficiencies since 1989, yet he was ultimately terminated for being behind in his work. Indeed, the failure to provide Mason with assistance when he asked for it may have contributed to his increased workload and ultimately to his failure to complete his tasks.[3] Mason has presented enough evidence that the City applied its legitimate expectations in a disparate manner among similarly situated employees.

---

[3]While this Court cannot compare Marquez to Mason because of facts missing in evidence, this Court acknowledges that Marquez asked for help and received it, which the City does not dispute. (R. 63-1, Defs.'Resp. to Pl.'s Add'l Facts ¶ 69.)

## 2.    Pretext

Since Mason has established a prima facie case of discrimination, the burden now shifts to the City to "articulate a legitimate, nondiscriminatory reason" for its decision to terminate Mason. *Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005). If the City cannot articulate such a reason or if Mason can show that the City's reason is pretextual, then this Court must deny summary judgment. *Id.* "A plaintiff shows that a reason is pretextual 'directly by persuading the court that a discriminatory reason more likely motivated the [defendants] or indirectly by showing that the [defendants'] proffered explanation is unworthy of credence.'" *Id.* (citing *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). An employer's decision to hire "is pretextual when it is a lie—a phony reason meant to cover up a disallowed reason." *Id.*

The City asserts that Mason's failure to complete over 1000 applications for City employment was the reason for his termination. The City further argues that it is undisputed that Carr believed that Mason was performing poorly at work, that this belief was supported by the recorded observations of Mason's supervisors, and that Carr's belief was the reason he terminated Mason. The City has admitted, however, that Carr recommended Mason's termination because he was told by McGuire that Mason had hidden hundreds of applications in his office. (R. 63-1, Defs.'Resp. to Pl.'s Add'l Facts ¶ 96.) Carr himself had very little day-to-day contact with Mason, (*Id.* ¶ 108). McGuire, as we indicated earlier, may have had discriminatory animus, and this Court considers statements made by individuals who are not decisionmakers but who influenced the decisionmaking process in determining whether the actual decisionmakers had a discriminatory motive. *Rudin*, 420 F.3d at 723.

Furthermore, Mason  has presented enough evidence to suggest that there is a material

15

issue of fact as to whether the unprocessed or partially scored applications justified his termination. While the City claims that there were 636 partially scored applications, Mason was only shown 462 of these alleged partially scored applications. (R. 63-1, Defs.'Resp. to Pl.'s Add'l Facts ¶ 99.) Additionally, Mason has shown that at least some of the applications came while he was on FMLA leave. (*Id.* ¶ 95.) Mason has also shown that there is no written rule that required applications to be in the file room or vault to be considered fully scored.[4] Moreover, there is an issue of material fact as to whether those applications found in Mason's cubicle could still be accessed by those City departments looking to hire individuals and also whether partially scored applications are treated the same as un-scored applications for disciplinary purposes. (*Id.* ¶¶ 100-102.) Opel also testified in her deposition that there were no expectations or guidelines as to how many applications analysts were expected to score each day, week, or month and that analysts tried to score as many as they could. (*Id.* ¶ 73.) Simply put, there is an issue of material fact as to how applications for city employment are handled by analysts and what protocol the City expected its analysts to employ that makes this claim improper for resolution on summary judgment. Accordingly, Mason has raised an issue of material fact that the City's reasons for his termination were pretextual.

## B.     The Surveillance and Lack of Assistance

Mason also claims that the City discriminated against him by singling him out for surveillance and refusing to provide him with requested assistance. The City argues that this conduct does not rise to the level of an adverse employment action. An adverse employment

---

[4]The City admits that most analysts had an organization system that would allow their applications to be found if not placed in the vault, but it disputes that Mason had such a system. *Id.* ¶ 102.

action must be material in order to come within the ambit of Title VII and the ADEA. *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 661 (7th Cir. 2005); *Halloway v. Milwaukee County*, 180 F.3d 820, 826 (7th Cir. 1999). "Typically, adverse employment actions are economic injuries such as dismissal, suspension, failure to promote, or diminution in pay." *Markel v. Bd. of Regents of the Univ. of Wis. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002). In other words, "[t]he adverse action must materially alter the terms and conditions of employment," *Stutler v. Ill. Dept. of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001), and must be "more than [an employee's] mere subjective preference." *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).

Mason alleges that his supervisors' denial of assistance in processing his work and their "unreasonable" surveillance of his activities both constitute adverse employment actions. Absent any financial or other significant consequences, however, these factors by themselves likely do not constitute a material change in Mason's employment status. *See Burlington Northern and Santa Fe R.R. Co. v. White*, 2006 WL 1698953, * 6 (June 22, 2006) (noting that the language of the substantive anti-discrimination provision of Title VII is limited to actions that affect employment or alter workplace conditions). While Mason's allegation that his supervisors did not provide him with assistance in processing his work constitutes circumstantial evidence that the City may have been disproportionately applying its legitimate expectations and treating similarly situated employees differently, it does not, by itself, constitute an adverse employment action upon which Mason can base a Title VII claim. *Id.* (harder work assignments are not adverse employment actions); *Haugerud v. Amery Sch. Dist*, 259 F.3d 678, 691-92 (7th Cir. 2001) (additional work assignments are not adverse employment actions).

17

The "unreasonable" surveillance that Mason complains of also fails to meet the threshold established by the Seventh Circuit for what qualifies as tangible employment action, or discrimination "with respect to [the worker's] compensation, terms, conditions, or privileges of employment." *See Washington*, 420 F.3d at 660. Even assuming that it does qualify as a tangible employment action, the surveillance certainly does not rise to the level of being a "material" or "significant" employment action as required by Title VII. *See id.* at 661 (stating that a tangible employment action must be "significant" in order to qualify as discrimination so that "life's little reverses are not causes of litigation"); *see also Rhodes v. Ill. DOT*, 359 F.3d 498, 505 (7th Cir. 2004) (stating that "[n]ot everything that makes an employee unhappy qualifies as an adverse action for Title VII").[5] Therefore, Mason cannot establish a race, sex, or age discrimination claim with respect to his supervisors' denial of assistance in processing his work and their "unreasonable" surveillance of his activities.

## C.    Failure to Promote

Mason alleges that the City failed to promote him because of his race, gender, and age. A failure to promote claim is a separate and discrete actionable unlawful employment practice, *Nat'l R.R. Passenger Corp. V. Morgan*, 536 U.S. 101, 114 (2002), and Mason has not pled this claim as part of his amended complaint. (R. _, Am. Compl.) Accordingly, to the extent that

---

[5]Furthermore, Mason does not present enough evidence that another analyst, Nancy Bracamontes, was similarly situated and treated more favorably than Mason. Mason claims that he overheard another analyst complain that Bracamontes was never at her desk and that his cubicle was close enough for him to observe her absences. The statements from the co-worker are inadmissible hearsay, *Haywood v. Lucent Techs.*, 323 F.3d 524, 533 (7th Cir. 2003), and Mason presents no other evidence that the absences he observed were non-work related or whether Bracamontes was ever disciplined for not being at her desk. *Smith v. Potter*, 445 F.3d 1000, 1009 (7th Cir. 2006) (stating that self-serving statements without factual support in the record will not defeat a motion for summary judgment).

Mason is attempting to add a claim for failure to promote, that claim is dismissed.

Under normal circumstances, Mason could use evidence that the City failed to promote him to support his claim that the City failed to apply its legitimate employment expectations equally among similarly situated individuals. In this case, however, Mason has not alleged sufficient facts to show that Opel was less qualified than the for the promotion that she received. Thus, this Court rejects Mason's attempt to use evidence that the City failed to promote him in support of his other discrimination claims.

### D.    The February 2, 2004 Letter

Mason claims that the City retaliated against him for a February 2, 2004 letter protesting his discharge and alleging that the City's actions constituted discrimination. Mason has not presented any direct evidence of retaliation. Therefore, we will analyze his claim under the indirect method. To establish a prima facie case of retaliation under Title VII or the ADEA, Mason must show that: "(1) after lodging a complaint about discrimination, (2) only he, and not any otherwise similarly situated employee who did not complain, was (3) subjected to an adverse employment action even though (4) he was performing his job in a satisfactory manner." *Whittaker*, 424 F.3d at 647 (*citing Stone*, 281 F.3d at 642); *see also Isbell v. Allstate Ins. Co.*, 418 F.3d 788, 793 (7th Cir. 2005).

Mason has not identified any similarly situated employees for purposes of this claim. *See Scaife v. Cook County et al.*, 446 F3d 735, 741(7th Cir. 2006) (holding that the plaintiff has not established a prima facie case of discrimination or retaliation because he has not produced enough evidence to show that any similarly situated employees were treated more favorably). In fact, he does not identify any factual disputes with respect to his retaliation claim at all.

19

Therefore, his claim that the City retaliated against him for sending the February 2, 2004 letter fails.

## III.    Section 1981 Claim

Mason claims that the City discriminated against him on the basis of race in violation of Section 1981. In determining whether a plaintiff has established a race discrimination claim, Title VII and Section 1981 claims are analyzed in the same manner. *Singh v. Town of Mt. Pleasant*, 05-2131, 2006 WL 559383, * 4 (7th Cir. March 9, 2006). Because we have found that Mason has established a prima facie case of race discrimination in violation of Title VII, we also find that he has done so for purposes of Section 1981. Section 1981, however, only encompasses racial discrimination on account of the plaintiff's race. Unlike Title VII, Section 1981 does not include a prohibition against retaliation for opposing racial discrimination. *Hart v. Transit Mgmt. of Racine, Inc.*, 426 F.3d 863, 866 (7th Cir. 2005). To the extent that Mason's claim for retaliation is based on Section 1981, the City's motion for summary judgment is granted.

## CONCLUSION

Drawing all reasonable inferences in favor of Mason, the record requires the Court to conclude that he has established genuine issues of material fact requiring resolution at a trial. At this point in the litigation, it appears that a reasonable jury could rule in Mason's favor on some or all of the claims which will proceed to trial. Simply put, the undisputed evidence leaves this Court with many questions about the manner in which the City was operating its Employment Services division during the relevant time period. Summary judgment is thus denied as to Mason's FMLA retaliation claim and Section 1981 claim. Summary judgment also is denied as to Mason's race, age, and gender discrimination claims but subject to the limitations discussed in this opinion. The motion for summary judgment is granted as to all other claims. (R. 49-1, Defs.' Mot. for Summ. J.) Mason's claim for judicial review of the Personnel Board's decision is dismissed with prejudice. This Court encourages the parties to exhaust all settlement possibilities in light of this opinion. A status hearing will be held on July 12, 2006 at 9:45a.m. for the express purpose of setting a firm trial date.

ENTERED: _____

**Judge Ruben Castillo**
**United States District Court**

**Dated:** June 23, 2006

21